[No. 13167. *En Banc.* November 22, 1917.]

ENTIAT DELTA ORCHARDS COMPANY, *Appellant*, v. UNKNOWN HEIRS, IF ANY, OF SILICO SASKA *et al.*, *Respondents.*[1]

EXECUTORS AND ADMINISTRATORS—SALES—IRREGULARITIES. Irregularities in an executor's sale which do not go to the jurisdiction of the court are not available to one who fails to inquire into the same within the time limited by law, or within such time as she should have asserted her rights under equitable principles.

PUBLIC LANDS—PATENTS—RECITALS. Recitals in a patent have no controlling force, and the patent must have read into it the law under which the title it conveys was acquired, regardless of limitations in the patent.

INDIANS—HOMESTEADS—ALIENATION—STATUTES. The act of March 3, 1875, 18 Stat. 420, giving to every Indian the head of a family, who had abandoned his tribal relations, the privileges and benefits of the homestead law, is still in force and is not amended by the act of July 4, 1884, 23 Stat. 96, providing for the extension of the homestead laws to Indians located upon public lands under patents providing that the land should be held in trust for the use of the Indians for the period of twenty-five years; and the latter act does not

¹Reported in 168 Pac. 1130.

make the law such that all Indian titles evidenced by patent theretofore issued would be subject to a trust limitation of twenty-five years.

PUBLIC LANDS—PATENTS—CONSTRUCTION.  A notation on a final homestead receipt cannot change the law or the relation of the entryman to the government, or bind him to take under a statute mistakenly employed in receiving the application.

INDIANS—HOMESTEADS—PATENTS—ALIENATION.  Where an Indian had severed his tribal relations and was possessed of all the qualifications necessary to acquire title to public lands under the act of 1875, authorizing a patent to him with a limitation upon his right to convey fixed at five years, it is error for the land department to issue a patent under the act of 1884, authorizing patent to Indians who have not severed their tribal relations, with a limitation upon the power of alienation fixed at twenty-five years; and the fact that no fees were collected for the filings as authorized under the act of 1884, does not overcome other circumstances equally important tending to show an application and intent to take under the act of 1875.

SAME—HOMESTEADS—PATENTS—POWER TO CORRECT.  Since the land department has authority and jurisdiction to inquire into and adjudicate any claim to such tract, until the legal title thereto passes out of the United States, a patent to an Indian mistakenly made with a limitation of twenty-five years on the power of alienation, under the act of 1884, may be corrected by the department by cancellation and the issuance of a new patent, under the act of 1875, with a limitation upon the power of alienation of five years, to which the Indian was entitled.

INDIANS—HOMESTEADS—ACTS OF INDIAN AGENTS.  A defense in a foreclosure suit, made by the Indian agent, without the knowledge of the Indian patentee, under instructions from the land department, upon the ground that the Indian patent contained a restriction upon the power of alienation for twenty-five years, is not conclusive that the Indian intended to take under the act of 1884, governing patents issued to Indians who had not severed their tribal relations; and it does not preclude the Indian, who had severed his tribal relations, from applying for an unrestricted fee patent to which he was entitled under the act of 1875; especially where he had not filed the patent of record and was negotiating for the issuance of a fee patent.

Appeal from a judgment of the superior court for Chelan county, Ronald, J., entered February 2, 1915, upon findings in favor of the defendants, in an action to quiet title, tried to the court.   Reversed.

*Crollard & Crollard,* for appellant.

*Sam R. Sumner* and *A. J. O'Connor,* for respondents.

CHADWICK, J.—This action was brought to quiet title to a certain tract of land situate at the mouth of the Entiat river, in Chelan county. An Indian, Silico Saska, entered the land as a homestead. A patent was thereafter issued to him under the act of July 4, 1884. The patent contained the usual restrictions upon alienation and incumbrances for a period of twenty-five years. Saska thereafter applied for a cancellation of the patent which had been issued to him and for the issuance of a fee patent. After consideration of the facts attending his filing and of his situation, the department cancelled the trust patent and issued a patent in fee.

After the death of Saska, the land was sold at administrator's sale. Appellant, as the grantee of the purchaser at the sale, brings this action under chapter 1 of Title VI, Rem. Code, [§§ 785-809] to quiet title against the heirs and the unknown heirs of Silico Saska.

Respondent claims to have been a granddaughter of Saska. She contends, *inter alia,* that the probate proceedings under which the land was sold were fraudulent. We find with the trial judge that the allegations of fraud are not sustained by the proof. There are certain irregularities which, in our judgment, do not go to the jurisdiction of the court, and respondent having failed to avail herself of the privilege of inquiring into such irregularities within the time limited by law, or within such time as she ought to have asserted her rights, if any, under equitable principles, cannot now be heard to question the regularity of the probate proceedings.

The so-called trust patent was issued in 1896. It was never recorded by Saska. He made application for a cancellation of this patent in August, 1902. A fee patent was issued in September, 1902. Saska died in February, 1903. The real issue is whether the department had jurisdiction to inquire into the facts attending the filing and the status of

Saska after a patent had been issued under the act of 1884, and having determined the right of Saska to have a fee patent, to cancel the trust patent and issue a patent conveying the title in fee.

The facts are sufficiently set forth in the ruling of the department as declared in a letter from the commissioner of the general land office to the register and receiver at Waterville of date August 15, 1902.

"The patent issued to Silico Saska, October 22, 1896, upon Waterville final homestead certificate No. 39, Original H. E. 1414, for lots 3 and 4, sec. 16, lots 1, 2 and NE¼ NE¼, sec. 17, twp. 25 N. R. 21 E. W. M., Washington, was returned to this office by him July 17, 1902, through his attorneys, Messrs. Copp & Luckett, with an application for its cancellation and the issuance of a new one in lieu thereof in accordance with the law.

"The application is duly executed and verified by the patentee, and corroborated as to the facts by six witnesses.

"It appears from the records that Silico Saska, an Indian, formerly of the Columbia tribe, born in the United States, having severed his tribal relations and adopted the habits and pursuits of civilized life, made homestead entry No. 1414 at the North Yakima Land office, March 25, for the land above described under the act of July 4, 1884 (23 Stat., 96); that for many years prior thereto he had resided with his family upon said land, cultivated and improved the same as a home, having improvements the worth upwards of $500, and that final proof was made at the Waterville Land Office, to which the records had been transferred and Waterville final homestead certificate No. 39 issued with the following words written upon its face, viz., 'Indian Homestead Act' July 4, 1884.

"October 22, 1896, the patent, now surrendered, was issued to Silico Saska with the proviso that the United States does and will hold the land above described in trust for the period of twenty-five years in accordance with the provisions of the act of July 4, 1884, (*supra*).

"It further appears that the claimant renounced his tribal relations in 1879 before the clerk of court of Yakima county; that neither fees nor commissions were paid by the claimant on account of the entry and proof; that the patent has not

been placed of record in the county where the land is situated; and that the land is still in the possession of claimant.

"The patentee, Saska, bases his petition for cancellation upon the case of Kami Sam, in which the patent, issued upon Waterville final homestead, was cancelled in accordance with commissioner's letter 'B' of May 31, 1902, because it contained the twenty-five year trust clause.

"The two cases differ in this: Kami Sam made entry under the act of March 3, 1875 (18 Stat., 420), paying full fees and commissions, while in the present case, under the act of July 4, 1884 (*supra*), fees and commissions were not paid.

"In view of the fact that the case must be determined in accordance with the law applicable to citizens making homesteads, under the rule laid down in the Clara Butron case (unreported), department decision of August 31, 1899, and followed in the case of Kami Sam, the matter of the payment of fees is of no importance.

"If, as the records show, Silico, was a native born Indian who had abandoned all tribal relations and adopted the habits and pursuits of civilized life, then, as stated in the Butron case, sec. 6, act of February 8, 1887, (24 Stat., 389-390), clothed him with full citizenship, and as such citizen he is entitled to a patent 'without any restrictions except such as are imposed upon citizens generally.'

"That portion of sec. 6 (*supra*) material to the case is as follows, viz.: 'And every Indian born within the territorial limits of the United States who has voluntarily taken up, within said limits, his residence separate and apart from any tribe of Indians therein, and has adopted the habits of civilized life, is hereby declared to be a citizen of the United States, and is entitled to all the rights, privileges and immunities of such citizens, whether said Indian has been or not by birth or otherwise, a member of any tribe of Indians within the territorial limits of the United States, without in any manner impairing or otherwise affecting the rights of any Indian to tribal or other property.'

"Upon the abandonment of all tribal relations by an Indian 'citizenship results . . . under the terms of section 6,' (*supra*), Clara Butron (*supra*); *Turner v. Hollidan* (22 L. D. 215); *Felley vs. Hensley* (27 L. D. 502-4).

"In the case of *United States v. Saunders et al.* (96 Fed. Rep. 268-70-71), being an action to amend a deed made by

an Indian whose homestead patent contained the trust clause, Judge Hanford held that, since the passage of the act of February 8, 1887, sec. 6 (*supra*), an Indian, complying with the terms of said section 'was . . . a citizen of the United States entitled to all the rights, privileges and immunities of such citizens, including the right, to buy, sell and convey title.'

"In view of all the facts and law applicable thereto, I am of the opinion that the twenty-five year trust clause in the Saska patent should be cancelled and one issued in lieu thereof granting to him an absolute title to the land.

"For the reasons stated the trust patent will be cancelled and a new one issued in accordance with this letter.

"When issued it will be delivered to Messrs. Copp & Luckett, of this city."

Appellant contends that Saska was a qualified entryman and entitled, at the time of the filing and when the patent was issued, to a patent under the homestead law of 1862. Second: That if he was not entitled to a patent under the law of 1862, he was entitled to a patent under the act of March 3, 1875, and that the limitation under that act had expired at the time the fee patent was issued and long before the death of Saska. Third: That the trust patent was issued under a mistake of law and fact, as shown by the notation upon the final homestead receipt and the recitals of the trust patent, and that it was within the power of the land department to correct its error.

Respondent contends that the land commissioner had no authority to cancel the trust patent and to issue a fee patent in lieu thereof; that the trust patent was rightly issued and is still in effect; that the act of the department was without Congressional or statutory authority, and, whatever the right of Saska may have been, the department having acted, its subsequent attempt to cure what was conceived by the administrative officers to have been a mistake was entirely void, and that she, as an heir of Saska, has a present interest under the terms of the act of 1884, which provides for a withholding of title for the benefit of the widow and heirs.

The several homestead acts to which counsel have referred us as material to this case are:

The original homestead law of May 20, 1862; 12 Stat. 392; 6 Fed. Stat. Ann. 286.

The act of March 3, 1875; 18 Stat. 420; 3 Fed. Stat. Ann. 490; giving to every Indian the head of a family, or of the age of twenty-one years, who had abandoned his tribal rela.tions, the privileges and benefits of the homestead law; provided, that lands so acquired should not be subject to aliena.tion for a period of five years.

The act of July 4, 1884; 23 Stat. 96; 3 Fed. Stat. ·Ann. ·491; which gave to such Indians "As may be located upon the public lands" avail of the homestead laws "as fully and to the same extent as may be done by citizens of the United States." It was provided in this act that no fees or ·commissions should be collected on account of such entries. All patents were to be of legal effect and to declare that the land would be held in trust for the sole use and benefit of the Indian by whom such entry should be made, or, in case of his decease, for his widow or heirs, for a period of twenty-five years. It was further provided that, at the expiration of twenty-five years, the United States would convey the land to the Indian, his widow and heirs discharged of the trust.

It is now settled that the recitals in a patent have no controlling force upon the title of the grantee, and that "the patent must, when its legal effect is sought, have read into it the law under which the title it conveys was acquired, regardless of the limitations which may be expressed in such patent." *Felix v. Yaksum*, 95 Wash. 138, 163 Pac. 481.

It is also settled, contrary to an opinion prevailing in the land department and entertained by many courts, that the act of 1875 is an independent act still standing in its pristine integrity; that the act of 1884 is not amendatory of it, and does not make the law such that all Indian titles evidenced by patents theretofore issued, or even initiated after its passage, are subject to a trust limitation of twenty-five years. *Hem-*

*mer v. United States,* 204 Fed. 898 ; *United States v. Hemmer,* 241 U. S. 379.

Before discussing the power of the department to correct mistakes, it is necessary that we first ascertain whether a mistake was made by the department.   If, as held in *Felix v. Yaksum, supra,* the recitals in a patent are not binding or controlling, but the law must be read into the patent as a vital element in determining its legal effect, it follows that we must determine the facts upon which the entryman's claims were rested.   The logic of the law as at present declared is that the right of an entryman is to be determined by reference to the statute and not to the patent.   The legal right [governing statute] of the entryman arises in the facts which are admitted or proved.   The department found, Letter "B," that the legal right of the entryman was to have a fee patent issued in lieu of the trust patent, or that, which is the same thing, the qualifications of Saska and his showing of facts were such that the department should have given him a fee patent at the time the trust patent was issued.

Letter "B" is vigorously assailed by counsel, and the trial judge, who gave most painstaking care to the preparation of a written opinion, rejected it because, in his judgment, the decision of the department was not sustained by the authorities cited therein.

But we are nevertheless constrained to hold that Saska was entitled to a fee patent, or, in any event, to a patent under the act of 1875.   Either conclusion will avail appellant.   Saska had every qualification of a homesteader.   He was the head of a family, of the age of seventy years, had lived on the land all his life, had improved it to the extent of building two houses and a stable, had ten acres under cultivation and about fifty acres fenced.   He had severed his tribal relations and had taken upon himself the ways of civilized life and was a citizen of the United States.   It was his right to have the best title that the government could give to a citizen who had fully complied with the law.   The notation on the final home-

stead receipt by the receiver, or by some clerk, cannot change the law or the relation of the entryman to the government as it was fixed by the statutes, or bind him to take under a statute mistakenly employed in the purely ministerial acts of accepting the filing, certifying the proofs, and issuing the written evidence of a compliance with some one of the homestead laws.

To so hold is not to carry the rule beyond due bounds, for if a solemn recital of a limitation in a patent is not controlling unless sustained by some apt statute properly applicable to the facts of the case, then surely a recital in the final homestead certificate, "Indian Homestead Act, July 4, 1884," is not controlling to the extent that the law under which the title should have been issued cannot be subsequently asserted; or if it should be held that the general homestead law did not apply, Saska came within the law of 1875, and the true limitation—the law which should have been carried into the patent—had expired when the fee patent issued.

Saska was an Indian, born in the United States, the head of a family, over twenty-one years of age, and had abandoned his tribal relations. With every qualification prescribed by the act of 1875 on the one hand, we have the single collateral fact, in no way connected with his qualifications or his legal rights, of the notation "Indian Homestead Act July 4, 1884." Titles under the public land laws depend upon the right of the entryman, and not upon the administrative acts of the agents employed by the United States government to pass the evidence of its bounty.

Saska came clearly within every requirement of the homestead law and the act of 1875. He possessed higher qualifications than were necessary to the acquisition of title to public lands under the act of 1884; that is, he had abandoned his tribal relations. And when he made proof of this fact, since the act of 1875 has been declared to have been always in force and effect, unamended and unaffected by the act of 1884, it was notice to the government that he was entitled, if not to a

fee patent, to a patent with a limitation of not more than five years, for it is in that alone that the two acts differ. The conclusion may be fairly deduced, from a reading of the statutes, that the government, in aid of its well known policy made prominent in those times to encourage the abandonment by Indians of their tribal relations and settlement upon public lands (the allotment laws had not then been passed) by its Indian wards, had caused the act of 1875 to be enacted.

The two acts may be summarized, in so far as they differ, as follows: Under the act of 1875, if an Indian had abandoned his tribal relations, he might, upon satisfactory proof of that fact, take up public land. He would be required to pay the fees provided by law or prescribed by the department. In consideration of his abandonment of tribal relations, customs and restraints, the limitation upon his right to convey or incumber his land was fixed at five years.

Under the act of 1884, an Indian who had *not* severed his tribal relations, but who stood in the attitude of dependency as one of a tribe and as a ward of the government, might nevertheless avail himself of the homestead law, but by reason of his tribal character and his dependency as a ward of the government, no fees for filing or making proof were to be exacted of him, and for like reason, his title was to be retained by the government for a period of twenty-five years. This reasoning is strengthened by reference to the act of 1887, which may be justly regarded as a legislative interpretation. It makes one qualified under the act of 1875 a full citizen, whereas, one who might be qualified under the act of 1884 would not be affected by it.

We are satisfied that the department erred when it issued a patent under the act of 1884; that Saska, having been a citizen and having abandoned his tribal relations, was entitled to a fee patent, or a patent under the act of 1875, and that the error of the department came about because of a mistake of law, in that it assumed that the act of 1884 was an amendment to the act of 1875 and superseded it, at least in so far

as a limitation of twenty-five years was substituted for all limitations provided in prior laws, and that it applied to all titles thereafter initiated by an Indian without reference to his qualifications, his tribal relations, or want of tribal relations, or his citizenship. This construction was based upon an opinion rendered by the Attorney General in 1888. 19 Op. Atty. Gen. 166. This notion of the law was accepted by many courts, our own among others. *Frazee v. Spokane County*, 29 Wash. 278, 69 Pac. 779; *Frazee v. Piper*, 51 Wash. 278, 98 Pac. 760; *Felix v. Yaksum*, 77 Wash. 519, 137 Pac. 1037.

"I am of the opinion that this Act of 1884 was intended to be supplemental to and somewhat in modification of the Act of 1875, and that its provisions apply to all entries made under the Act of 1875 for which patents had not issued at the time the Act of 1884 went into effect." 19 Op. Atty. Gen. 166.

Counsel lays stress upon the fact that no fees were collected for the filing of the proof and that this is sufficient evidence that Saska took title under the act of 1884 and not as a citizen entitled to make homestead entry or as a nontribal Indian under the act of 1875. We grant that this is a circumstance to be considered, but it will not be allowed to overcome other circumstances equally important in their bearing. All attending circumstances must be measured by the legal right of the entryman. The most favorable statute that will apply to the established character and qualifications of the entryman ought to be applied. The failure to exact fees was not the act of Saska, nor is this a case where the United States is questioning the force and effect of the later patent. If the register and receiver failed to collect the proper fees, a remedy was available. Their error should not operate to deny a right or limit a title to which the entryman is otherwise entitled.

This brings us to the final and controlling question, whether the department had power and jurisdiction to correct its er-

ror.    That the department, having power to determine the qualifications of an entryman and to dispose of the public domain, under existing laws and such rules and regulations as may be prescribed, has power, upon the petition of an entryman, to correct an error of judgment going only to the legal conclusion to be drawn from an admitted state of facts would seem to be self-evident.    There is a vast difference between an improper exercise of power and want of power.    If there be power or jurisdiction to do a certain thing or accomplish a result sanctioned by law, then all acts of administrative officers will be construed in aid of the thing which the law has sought to accomplish.    But if there be no power or jurisdiction to deal with the subject-matter, then no act of an administrative officer will aid the record, for there is no law to sustain it.    In the one case, the purpose of the law is accomplished; in the other, it would be denied.

The department has at times, following the opinion of the several commissioners, held the one way or the other.    That it had authority and that it had not.

Out of the confusion of opinion, Justice Van Devanter, then Assistant Attorney General, in the case of *Lizzie Bergen*, 30 Land Dec. 258, found the true rule to be as announced in *Michigan Land & Lumber Co. v. Rust*, 168 U. S. 589, where it is said, "The power of the department to inquire into the extent and validity of the rights claimed against the government does not cease until the legal title has passed."    See case of *Lizzie Bergen*, 30 Land Dec. 258; *Hawley v. Diller*, 178 U. S. 476.    In *Parcher v. Gillen*, 26 Land Dec. 34, it is said:

"The true rule drawn from an examination of all the authorities is that the jurisdiction of the land department ceases where the jurisdiction of the courts commence, viz., when the legal title passes, and there is no hiatus between the termination of the one and the beginning of the other.    Under this rule the land will always be within a jurisdiction which can administer the law and protect both public and private rights.  .  .  .

"So long as the legal title remains in the government the Secretary of the Interior, whoever he may be, is charged with the the duty of seeing that the land is disposed of only according to law. The issuance of a patent is the final act and decision in that disposition and with it and not before does the supervisory power and duty of the Secretary cease."

Mr. Van Devanter concludes his observation:

"The well established rule is that so long as the legal title to any tract of the public domain remains in the United States, this Department has authority and jurisdiction to inquire into and adjudicate any claim to such tract and to see that it is disposed of and the legal title passed only according to law, but when the legal title thereto passes out of the United States that authority and jurisdiction of the executive department ends and thereafter the courts have exclusive jurisdiction in the premises." 30 Land Dec. 258.

Unmindful of the right of the entryman, the department, under a mistaken conception of the law, had retained title, both legal and equitable and, under the authorities cited, had complete jurisdiction. The jurisdiction had not ended, and the jurisdiction of the courts had not begun. The only forum to which Saska could appeal was the department. If this be not so, then however grievous an error of the department might be, an Indian entryman would be powerless to petition for a correction of the wrong until after the lapse of a limitation which had been unlawfully imposed. This conclusion seems inevitable when we consider that the trust patent is not a patent at all, but, in legal effect, no more than a certificate evidencing the right of an Indian entryman to receive, at some future time, a patent conveying the fee title.

Counsel urge with much vigor that the policy of Congress to discountenance the acts of the department in cancelling a patent of one kind and issuing another is manifested in no uncertain way by its several acts. The act of January 26, 1895; 28 Stat. 641; 3 Fed. Stat. Ann. 502: the amendatory act of April 23, 1904; 33 Stat. 297; 10 Fed. Stat. Ann. 141 [U. S. Comp. St. 1916, § 4212]; and the act of October 19,

1888; 25 Stat. 611; 3 Fed. Stat. Ann. 499. They urge that, if an injustice has been done to an Indian, the proper forum for relief is Congress. It is upon this theory that the trial judge rested his judgment. He says:

"These acts and others intervening not referred to are positive evidence that up to January 26, 1895, Congress understood that the United States was still holding Indian titles in trust; but it seems to me if any more evidence is needed to make conclusive that such was the policy of Congress, it lies in the fact that in the numerous acts thereafter passed with reference to Indians, and the numerous treaties with the various tribes, there is contained in every such act or treaty which I have examined a condition or restriction upon the right of alienation. From the inception of the legislation to the last act of the subject, no affirmative expression by Congress can be found removing restrictions or governmental control from lands of full-blood Indians. The history of such legislation, the special agreements with various tribes, and the uniform policy of the government, make a strong presumption against the claim that Congress intended to permit the alienation of lands by full-blood Indians free from all restraint. This interpretation has the support, not only of immemorial legislation and executive usage, but likewise of Federal judicial sanction."

These several acts were passed with particular reference to allotted lands. *Lizzie Bergen,* 30 Land Dec. 258. Counsel insist, however, that they sufficiently indicate the policy of the government with reference to all of its dealings with Indians. Cases are cited holding that an Indian title is charged with such restrictions as are in the statute whether recited in the patent or not, and that the retention of a wardship over the Indian is not inconsistent with the grant of citizenship and the issuance of a fee patent. With these propositions we have no quarrel, but if there be no restrictions in the statute which should have been applied, then the cases are not apposite. To state the proposition in another way, if we take the law and the facts, and not the words and form of the patent, as controlling, Saska was entitled to a fee patent, or a patent

under the law of 1875, and there was no wardship, or the period of wardship had expired.

But, as pointed out in the case of *Lizzie Bergen,* "A legislative enactment based on a misconception of the law does not *per se* change the law so as to make it accord with the misconception." Sutherland, Statutory Construction, § 231.

"It is an obvious inference from what has gone before, that enactments of any specific provision on a particular subject are not to be regarded as conclusive declarations that the law was different before." Endlich, Interpretation of Statutes, § 374.

"But the enactment of a specific provision on a given subject does not, of itself, prove that the law on that subject was different before; for such enactment may have been made in affirmance of the existing law, and to remove doubts." Black, Interpretation of Laws, § 90.

If, as has been repeatedly held by the supreme court of the United States, the government, acting through the department of the interior has complete jurisdiction over its public land up to the time the legal title passes, we cannot bring ourselves to believe that the enactments referred to were enacted because there was a lack of authority, but because Congress, acting upon the opinion of the Attorney General and the request of the commissioner of the general land office, misconceived the law.

But if we grant that there may have been a want of authority in so far as allotted lands are concerned, it does not follow that it should be so held with reference to land entered under the general homestead law. We find no statute or decision denying to a citizen Indian, who had severed tribal relations and entered public lands under the homestead laws, the right to seek all remedies as freely as any other citizen may. That the department has complete jurisdiction over the public lands until title has passed has never been doubted or denied. *Knight v. United States Land Ass'n,* 142 U. S. 161; *Michigan Land & Lumber Co. v. Rust,* 168 U. S. 589.

But even if we accept the theory of respondent that the statutes relating to allotted lands evidence the policy of the government with reference to all lands conveyed to Indians, it may be argued plausibly that the acts referred to indicate the intention of Congress to declare that the land department has authority to correct errors in the issuance of its patents. It is just as logical to say that an act of Congress permitting the correction of errors occurring in the patents of allotted lands includes all other lands conveyed to Indians as it is to say that the acts correcting errors in the grant of allotted lands apply to homestead lands.

It is not necessary to go beyond the recent decision of the supreme court in the case of *United States v. Hemmer*, 241 U. S. 379, which, if we have a right appreciation of it, holds the act of 1884 was not intended to apply to Indians having the qualifications and situate as was the Indian Silico Saska. The court held, notwithstanding the words of the act, "That such Indians as *may now be located on public lands*, etc.," [Italics are ours] that it did not include "Indians who were proceeding under the act of 1875." This holding following:

"Regarding Taylor simply as an Indian those words [Indians then located on public lands] might be considered to be applicable to him; regarding the purpose of the act, which was to confer a benefit, not to confirm one, they did not apply to him or to Indians in his situation, for he and Indians such as he, were the beneficiaries of the prior act, and he and other Indians, it may be,—but certainly he—had substantially performed its conditions."

The act of 1875 applied to a class of Indians "who had separated themselves from their tribes and the influence of their tribes, who had advanced, therefore, to a higher status and were better prepared to manage their affairs than Indians in general."

The supreme court emphasizes the thought that there are classes among Indians. It says of the act of 1884:

"Its language was not of confirmation of rights but was permissive and prospective and related to the initiation and

acquisition of rights by a different class. And having this definite purpose, it would be difficult to suppose that, besides, rights acquired under prior laws were intended to be limited without reference to such laws."

No argument is to be drawn from the suggestion made by the court that Taylor's rights had accrued and that his "situation" was fixed nearly a year before the passage of the act of 1884, for if the acts be independent of each other, the time when the act of 1875 was passed, or the time when the act of 1884 was passed, or the time when a right was initiated would be wholly immaterial. It follows, also, from the case just cited, that although it is the policy of the government to protect Indians from hasty and improvident alienation of their lands, that policy is satisfied by the act of 1875 when an Indian entryman, by his proofs, makes it plain that he is one of the class to which the act of 1875 applies.

In oral argument much was made of the fact that Saska, with other Indians, had defended an action to foreclose certain delinquent tax certificates brought by Chelan county early in the year 1902. The defense was made that the several tracts of land held by the Indians had been acquired under the act of 1884, and, for that reason, were not subject to taxation. This, with the fact that the register and receiver collected no fees, is considered sufficient evidence of the intent of Saska to sustain the holding that the land was entered, and that he intended to take under, the act of 1884. We are not convinced that this fact is available to respondent, or that it would be a weapon in the hands of any litigant other than the United States government. But it may be answered. After the court below had announced its ruling, appellant moved to reopen the case. This motion was supported by the affidavit of Major A. M. Anderson, the then Indian agent, to the effect that he had acted upon advices from Washington, D. C., and without the knowledge of Saska; that he had caused an appearance for the several Indians, including Saska, to be entered, and had set up the defense that the lands were held

under a trust patent. The trial judge rejected these affidavits as immaterial, and from his conception of the case they were immaterial, but we think they were material as tending to negative the conclusion that respondent draws from that proceeding. It is not made to appear that Saska was a party to the action, except in so far as the Indian agent had used his name in defending it.

From the viewpoint of the respondent, the most material point in the case is whether Saska really intended to claim under the act of 1884. In measuring intent, weight must be given to those circumstances resting in the conduct and the appreciated acts of the party charged, and not in collateral circumstances for which he is in no way responsible. But if this fact were to be taken alone and given weight, we think it is overcome by the fact that Saska had not acted upon his trust patent to the extent of recording it and, at this time, must have been negotiating for the cancellation of the trust patent and the issuance of a fee patent, for in August of the same year a petition was filed and granted by the department.

Our conclusion upon the main issue makes it unnecessary to discuss other questions—whether respondent is in fact an heir of Saska; whether she is barred by the statute of limitations, state or Federal or both; whether this proceeding is a collateral attack within the rule of *United States v. Winona & St. P. R. Co.*, 67 Fed. 948; *King v. McAndrews*, 111 Fed. 860; and *Mary Seaples v. Ida B. Card* (an unreported decision of the district court for the eastern district of Washington, filed September 23, 1915); and whether the title, although under the act of 1884, is cured by an act confirming the fee patent passed by the Congress of the United States on February 15, 1917.

The decree of the lower court is reversed, with instructions to enter a decree in favor of appellant.

ELLIS, C. J., MOUNT, FULLERTON, MORRIS, HOLCOMB, and PARKER, JJ., concur.

WEBSTER, J., took no part.