**UNITED STATES v. KRAUSE et al.**

**Civ. A. No. 2497.**

United States District Court
W. D. Louisiana, Lake Charles Division.

Sept. 6, 1950.

William J. Fleniken, United States Attorney, Shreveport, La., Sol B. Pressburg, Special Attorney, Alexandria, La., for plaintiff.

Liskow & Lewis, Lake Charles, La., for defendants Mrs. Della Bel Krause, Albert Bel Fay, Ernest Bel Fay, John Albert Bel, Mrs. Floy Moss Bel, Harry C. Hanszen, Katherine Bel Gardiner Glassell, James Ware Gardiner, Mrs. Marie Gardiner Garrison, Bel Investment Co., Inc., Amos Richard, Heirs of Mrs. Della Goos Bel, and Daisey Bel.

Patin & Patin, Lake Charles, La., for defendants Ulyese Ardoin, Dolzie Langley, Mrs. Pauline C. Lafleur and Mrs. Celise Guillory.

Alva Jones, Asst. Dist. Atty., Oakdale, La., for Allen Parish, La.

PORTERIE, District Judge.

This is a suit brought by the United States to have certain patents issued to Boy Williams, Jackson Langley, Amos John, Alfred John, Polly Williams, Alex-

ander Jeanpierre, John Abet, John Poncho, Henry Thompson, and George Abbot construed in accordance with the Act of July 4, 1884, and so that all conveyances of the lands involved not approved by the Secretary of the Interior be set aside, that all illegal tax assessments and tax sale proceedings be set aside and the title to the lands be quieted in the present Indian claimants. The complaint further seeks to have the court declare that the said defendants named in the petition, and each of them, have no interest or estate whatsoever in or to said lands or premises and that title of the complainant, the United States of America, is good and valid, save and except any and all rights acquired by the patentees under the aforesaid Act of Congress, that the said defendants, and each of them, be forever enjoined and restrained from asserting any claim whatsoever in and to said lands and premises adverse to the complainant.

The first significant point that occurred at the trial, immediately upon the opening of the Government's case, was that the original patents, all signed by President Theodore Roosevelt, all failed to mention the Act of July 4, 1884, 23 Stat. 96, 43 U.S. C.A. § 190. Each patent has the following language: "* * * [P]ursuant to the Act of Congress approved 20th May, 1862 [12 Stat. 392], 'To secure Homesteads to Actual Settlers on the Public Domain,' and the acts supplemental thereto".

This is the document that gets registered in the alienation records of the Parish of Allen, Louisiana, wherein the property is located. This is the only actual notice to the general buying public. The defendants bought on the face of this record.

However, in each one of the full exhibits presented by the Government in support of each entryman named above, the Government has filed some other documents. These documents being denominated as homestead proof with affidavit, testimony of claimant, two testimonies of witnesses, notice of local publication, certificate as to posting of notice, homestead affidavit, notice of entry in some cases, receipt or absence of receipt of money for the entry, certificate of homestead, etc.

On many of these documents, there appear several notations, referring directly, or by inference, to the fact that an Indian is involved and that the application is under the Act of July 4, 1884. These documents were never recorded in Louisiana and are brought to the case from the Archives of the General Land Office at Washington, D. C.

The principal defense is to the effect that although the patentees might have been classed as Indians all of them had abandoned any tribal relations that they might have had and had adopted the habits of civilized people and, therefore, the law did not restrict them to patents under the Act of July 4, 1884, and the trust estate created thereby.

And the defense argument is that the patentees were qualified to receive fee patents under the general homestead law or under an Act of 1875 (dealing with non-tribal Indians) discussed later on; that the Department, therefore, had jurisdiction and authority to issue the patents in suit and that its decision, evidenced by the patents themselves, cannot be upset by this court.

Alternatively, defendants allege acquisitions of titles in good faith without any knowledge whatever of any possible claim against the patents that were issued by the United States and which it really seeks here to set aside in order to regain title for itself rather than for the patentees or any other known or identified persons.

Defendants also alternatively plead the six year Statute of Limitations against the United States setting aside the patents for its own benefit.

The Government claims, in Article 5 of its petition, as follows: "Your petitioner further shows that its officers failed and neglected to embody in said patent the conditions and reservations and limitations upon the title to be granted as in said Act specified, and which they are commanded to incorporate in all patents issued under said Acts of Congress; and claimant avers that said officers issued said patent inadvertently, erroneously, wrongfully, and without authority of law, that same is of no effect and that the executive officers

who issued said patent could not and had not the power to dispense with the provisions of said Act of Congress."

The Act of July 4, 1884, previously referred to, provides: "Such Indians as may have been located on public lands, prior to July 4, 1884, or as may, under the direction of the Secretary of the Interior, or otherwise, thereafter, so locate may avail themselves of the provisions of the homestead laws as fully and to the same extent as may now be done by citizens of the United States. No fees or commissions shall be charged on account of said entries or proofs. All patents therefor shall be of the legal effect, and declare that the United States does and will hold the land thus entered for the period of twenty-five years, in trust for the sole use and benefit of the Indian by whom such entry shall have been made, or, in case of his decease, of his widow and heirs according to the laws of the State where such land is located, and that at the expiration of said period the United States will convey the same by patent to said Indian, or his widow and heirs as aforesaid, in fee, discharged of said trust and free of all charge or incumbrance whatsoever." 43 U.S.C.A. § 190.

The main question we have to decide is whether or not, under these circumstances, the defendants bought on notice that the Act of July 4, 1884, affected the titles they received when they or their ancestors in title bought from these original entrymen.

One inconsistency in the complaint of the Government is that the title to the land described is sought to "be quieted in the present Indian claimants" but yet in the prayer for a judgment the following is also sought: "that title of the complainant, the United States of America, is good and valid". There has been no proof of title by anyone from the original entrymen named, except the proof of title as made from the original entrymen by the defendants. From the evidence adduced in the case, we find that the defendants bought in good faith. They bought upon the face of the alienation records of the Parish where the land is located. There was nothing there to indicate the application of the Act of July 4, 1884. The document of patent entry is exactly the same in all the cases; it is styled: "To secure Homesteads to Actual Settlers on the Public Domain".[1]

Plaintiff's prayer does suggest that the title be quieted in the present Indian claimants and that is a thing of importance to be kept in mind in considering the right to proceed or for even determining the basic legal questions that could arise. For there

---

1. The Louisiana citizen is long-and well-trained in relying upon the face of the alienation records. The leading cases of Broussard v. Broussard, 1893, 45 La. Ann. 1085, 13 So. 699; and of McDuffie v. Walker, 1909, 125 La. 152, 51 So. 100, established the rule definitely that equities between vendor and vendee cannot be urged against a bona fide purchaser. The McDuffie case goes further and practically protects the purchaser when not in good faith. Hundreds of cases have followed and reaffirmed the doctrine that the alienation records on their face control, and the factual instances are as different and varied as human relations usually make them. See Angichiodo v. Cerami, D.C., 28 F.Supp. 720, 722, [4].

How could the injustice as sought to be perpetuated by the Government here against the defendants be permitted? Should not the legal characteristics given the Louisiana citizen in his business customs overbalance the unjust interpretation given the Joyce case, infra, by the Government here? Should the Department of the Interior be permitted to place these patents in the alienation records of a state like Louisiana—where the state law is so strict, to the effect that the record controls—and still retain the right that it is now pleading for in this case? Is such a trap to prevail?

We must remember, as would the United States Supreme Court, that: "The fourteenth amendment did not radically change the whole theory of the relations of the state and Federal governments to each other, and of both governments to the people. The same person may be at the same time a citizen of the United States and a citizen of a State." In re Kemmler, 136 U.S. 436, 438, 10 S.Ct. 930, 934, 34 L.Ed. 519, 534.

The common legal habits of the state citizen should prevail as against a far-fetched secret equity.

are no *present Indian claimants* to these lands so far as the complaint alleges or the record shows; the patentees are all dead and there is no proof whatever of any legitimate children or other heirs who could succeed them. So the whole claim, when founded on the idea that title be quieted in the "present Indian claimants", is striken with nullity and the suit turns into one by the United States to recover title for itself; for this must follow when no effort was even made to prove to this court the names, the ages, the relationships of anyone who could succeed to the rights of the patentees if any now existed. And no judgment could possibly be rendered reciting for whose benefit the title is to be quieted (unless it is for the United States) as against the defendants who actually own the land.

We espouse the following language of the defendants:

"For the philosophy behind the decisions on which Plaintiff would rely has always been grounded on the basic responsibility of the United States to certain classes of Indians who are wards of the Government and to whom it owes a duty to protect not only in their personal lives but in their property and property rights, all on the theory that they have not yet reached the stage of civilization or development that would allow them to deal with themselves or with their things as their own. But here a different class of Indians who are citizens of the United States first were named as patentees; whether they have legitimate heirs or children or other descendants does not appear except from some loose expressions by one or two witnesses indicating some possible kinship with one or two of them. But the patentees themselves were not within the class of wards of the Government and there are no persons by name appearing as beneficiaries of the rights which plaintiff here seeks.

"It also should be kept in mind throughout that Plaintiff carries the burden of this lawsuit and to even have a suspicion of right in its favor it must at least prove the allegation that the Land Department of the United States issued the patents 'inadvertently, erroneously, wrongfully and without authority of law' and that they 'could not and had not the power to dispense with the provisions of said Act of Congress' (the Act of 1884)."

The oral testimony proves that the patentees have all died and that no legitimate descendants or heirs of the patentees who could benefit by this proceeding are known. The oral evidence also indisputably revealed that not one of the Indians or so-called Indians who were named as patentees had ever maintained any tribal relations but that they had adopted civilized life.

Only one patentee, Jackson Langley, was proved not to be full-blooded Indian.

That no fees or commissions were paid in any case except by Boy Williams is not quite correct. The record with respect to Henry Thompson, for instance, shows entry under R. S. § 2291, 43 U.S.C.A. § 164, and contains a receipt for money paid. The record of Alexander Jeanpierre shows payment and that of George Abbot, with entry under R. S. § 2289, 43 U.S.C.A. § 161, contains final Receiver's Receipt for cash. Each record finally acknowledges that payments required by law have been made although in some cases the amounts are not shown.

Plaintiff's brief says "that it is clear that the entrymen intended to take advantage of Act of July 4, 1884 and were entitled to 25 year trust periods". Even if it were true, *their intention* could not control; it is a question of what law governed them, of the authority of the Land Department, and of the decision reached by its officials. While in the beginning most of the patentees did make such applications the final proofs showed that they were not tribal Indians but had abandoned such relations and adopted the habits of civilized life. So even though they might first have entered the lands under the Act of 1884 they were entitled to receive, as they did receive, full patents or at least fee patents subject only to the Act of 1875 discussed later on.

The facts of the case show, without question, that these Indians named by the Government had abandoned any tribal relations that they might have had and had

adopted the habits of civilized people and that no Government agent was among them or with them.

■ We find that these patentees were qualified to receive patents under the general homestead laws or under the Act of 1875 (dealing with nontribal Indians).

At the time the Act of July 4, 1884, was adopted, there was in force the Act of March 3, 1875, 43 U.S.C.A. § 189, reading as follows: ."Any Indian born in the United States, who is the head of a family, or who has arrived at the age of twenty-one years, and who has abandoned, or may hereafter abandon, his tribal relations, shall, on making satisfactory proof of such abandonment, under rules to be prescribed by the Secretary of the Interior, be entitled to the benefits of this chapter [Chapter 7.—Homesteads], except that the provisions of section 173 of this chapter shall not be held to apply to entries made under this section: *Provided, however,* That the title to lands acquired by any Indian by virtue hereof shall not be subject to alienation or incumbrance, either by voluntary conveyance or the judgment, decree, or order of any court, and shall be and remain inalienable for a period of five years from the date of the patent issued therefor: *Provided,* That any such Indian shall be entitled to his distributive share of all annuities, tribal funds, lands, and other property, the same as though he had maintained his tribal relations; and any transfer, alienation, or incumbrance of any interest he may hold or claim by reason of his former tribal relations shall be void."

This Act as it now appears in the Code gives Indians there referred to benefits of "this chapter", which is the chapter dealing with homesteads on public lands. The exception to the effect that the provisions of Section 173 of the same chapter shall not apply is of no importance here; it is mentioned to save searching the books for an explanation of what it means. Section 173 of the chapter which does not apply to entries made under the Act of 1875 gives the right to some homestead applicants to reduce the time required for obtaining patents to fourteen months under certain conditions.

It should also be particularly mentioned and kept in mind that the Act of 1884 requires that patents issued thereunder declare that the United States will hold the land in trust for a period of twenty-five years.

But the Act of 1875 does not require that any limitation be written into the patents issued thereunder; although it is said that the lands so patented to the class of Indians so named should remain inalienable for a period of five years—long since expired. Nor is it defendants' burden to place the patents under the 1875 Act or under the general homestead law. The proof of the patentees' qualifications (nontribal Indians) supports the jurisdiction of the Land Department to issue full patents, so as to deny the very basis of plaintiff's suit—that the patents only could have legally issued under the 1884 Act.

We do not believe that the United States of America can legally and legitimately claim, in view of the above facts and the applicable law, that the officers of the United States issued said patents "inadvertently, erroneously and without authority in law". The documents in the alienation records in the parish where the property is located said, to repeat: "* * * pursuant to the Act of Congress approved 20th May, 1862, 'To secure Homesteads to Actual Settlers on the Public Domain,' and the acts supplemental thereto".

■ These Indians, of course, appeared to the prospective buyer as Indians who could legally enter lands and get patents under the general homestead laws of the United States; and that settles the case.

The Government relies very much on the case of United States v. Joyce, 8 Cir., 240 F. 610, 611. The facts in the Joyce case, in our opinion, are substantially different from the facts in the instant case; to such a degree that a different conclusion of law must be reached as between the two cases.

First of all, the opening paragraph in the Joyce case, supra, says: "John Wakemup, Sr., a Chippewa Indian, a ward of the government and in charge of an Indian agent, on April 16, 1892, entered certain public lands, that is, lands not in any In-

dian reservation, to wit, * * *" etc. But the Indians in this case were not in charge of any Indian agent and never had been; they had no tribal relations and they were not wards of the Government, but occupied the status of citizens of the United States and had the right to full patent, at least under the Act of 1875. John Wakemup, Sr., could not have acquired under the 1875 Act and no argument was ever made in that case that he was entitled to patent ·by reason of its provisions.

In the instant case, each one of the original patentees sold his land for money (and a consideration was received) on the face of the patents, as described, to a purchaser in good faith.

In fact, the only defense made in the case that was considered serious was the plea of the six year Statute of Limitation; and then the court overruled it by holding that the suit did not seek to cancel the patent but merely to construe it under the law under which it actually issued even though it did not contain the trust provision as required by that law. Even to that extent the decision does not control here against the present plea of six year limitation. For there, as readily appears from the decision, the claim of the United States was for and on behalf of certain known and named Indian heirs of the patentee, while here there are no present claimants known or named and the prayer seeks title to be restored to the "United States of America" excepting only "any and all rights acquired by the patentees under the aforesaid Act of Congress". When the patentees are dead and no heirs are proved there could be no present rights in the patentees under the Act of 1884, if it should be applied, and, therefore, this suit in reality seeks to set aside the fee patents and restore fee title to the Federal Government.

In the Joyce case, supra, it was assumed and not disputed that the patent was actually issued under the Act of 1884; it had to be so admitted there because the Land Department had no jurisdiction to give John Wakemup, Sr., a fee patent under some other law when he was a tribal Indian in charge of an Indian agent. But here the contrary is true; it has not been admitted that the patents issued or should have issued under the 1884 Act, but that claim is definitely denied because the Indians were of another class. And here, different from the Joyce case, the Land Department did have jurisdiction to issue full fee patents containing no restriction and subject to no limitations unless it would have been the five year restraint on sale in the Act of 1875. The Land Department exercised its jurisdiction and its findings, evidenced by the patents, cannot be disturbed.

We conclude, therefore, that the Joyce case, supra, is not definitive of the issues in the instant case in favor of the Government; to the contrary, its holding is in favor of defendants.

We believe the case of United States v. Hemmer, 241 U.S. 379, 36 S.Ct. 659, 661, 60 L.Ed. 1055, decisive. That case dealt with an Indian, like the Indians here, who had abandoned his tribal relations and who is entitled to the benefits of the homestead law, subject only to the restrictions in the Act of 1875. The Circuit Court, later upheld by the Supreme Court, agreed that the Act of 1884 did not repeal or modify the earlier law so as to prevent patent issuing in full to an Indian who had no tribal relations and who came within the class dealt with by Congress in 1875.

While the Supreme Court's decision is the one that must be given full weight, the Circuit Court opinion is referred to at this juncture principally to point out that the same Court that decided the Joyce case knew and recognized the distinction between the two classes of Indians and the laws that applied to them. The difference was not even discussed in the Joyce case, supra, because there it was assumed from the pertinent facts that the patent issued, and could only issue, under the law of 1884.

But the two statutes, 1875 and 1884, were distinguished in the Hemmer case, supra, by the same Circuit Court and also when it reached the Supreme Court of the United States.

The Hemmer case, supra, arose long after the patent issued and after applica-

tion was made for a homestead by an Indian named Taylor. Taylor, according to the decision, was a Sioux Indian "* * * having the qualifications it [Act of March 3, 1875] described (that is, who was born in the United States, was twenty-one years of age, the head of a family, and who had abandoned his tribal relations) * * *". He applied for a homestead prior to the Act of 1884 but after the adoption of the Act of 1875, although his final proof was not made until after the Act of July 4, 1884. The Government claimed that because of the passage of that Act, the patent which issued to him should have been under the Act of 1884 and should have contained the restriction by which the Government held the land in trust for twenty-five years. It so happened that the patent erroneously contained another restriction which did not apply to Taylor, because it was under an Act of 1881, dealing only with Indians of another tribe. The Act of 1881 was "* * * put to one side * * *" by the Supreme Court, because it had no relation to the title then in contest.

The Court upheld the patent as having been authorized by the Act of 1875 and issued under it regardless of the passage of the Act of 1884.

The final decision in the case was that the two Acts were not opposed to each other; that they had "* * * different fields of application * * *"; and, that the Act of 1884 did not restrict the rights of an Indian acquired, or to be acquired, under the Act of 1875.

The United States Supreme Court further said:

"Under the act of 1884 Indians located on the public lands at the passage of the act, or that might, under the direction of the Secretary of the Interior, or otherwise, thereafter so locate, might avail themselves of the provisions of the act.

"The act of 1875 was more circumscribed. It did not apply to Indians generally, but to those of special qualifications,— those who had separated themselves from their tribes and the influence of their tribes, who had advanced, therefore, to a higher status and were better prepared to man-age their affairs than Indians in general. And it might well have been considered that a five-year restriction upon the alienation of their titles, added to their five years' residence, would give them an appreciation of values sufficient to protect them against the improvidence of their race and the imposition of others." United States v. Hemmer, 241 U. S. 379, 36 S.Ct. 659, 661, 60 L.Ed. 1055.

See, also, United States v. Corporation of the President, etc., 10 Cir., 101 F.2d 156; Seaples v. Card, D.C., 246 F. 501; Entiat Delta Orchards Co. v. Unknown Heirs of Saska, 99 Wash. 84, 168 P. 1130; Dickson v. Luck Land Co., 242 U.S. 371, 37 S.Ct. 167, 61 L.Ed. 371; United States v. Price, 10 Cir., 111 F.2d 206.

We wish to quote from the case of King v. McAndrews, 8 Cir., 111 F. 860, 863:

"A patent of land within its jurisdiction, issued by the land department, is the judgment of that tribunal, and a conveyance of the legal title to the land to the patentee in execution of the judgment.

\*       \*       \*       \*       \*       \*

"The test of the jurisdiction of this tribunal is the true answer to the question, had the department the power to hear and determine the claims of the applicants of the land and to dispose of it in accordance with its decision? If that question can be answered in the affirmative, the land department had jurisdiction of the case, and the patent which evidences its decision conveys the legal title, and is impervious to collateral attack."

To revert to the Hemmer case, supra, the United States Supreme Court very rightly said: "Taylor and those in like situation did not need the aid of the act of 1884."

Likewise, in the instant case, these entrymen did not need the Act of 1884. The patents placed in the alienation records refer to the general homestead laws. These individuals, though Indians had all the qualifications to make use of the general homestead laws. It is true that some of the paper work, some of the original applications, etc., behind these patents, referred to the Act of July 4, 1884, and served as

the basis for the patents; nevertheless, there was legal issuance of the patents under the general homestead laws and these individuals legally qualify thereunder and their acts subsequent to the placing of their patents in the alienation records were in line with the ownership of property as an entryman is vested with under the general homestead laws.

It would be the grossest injustice for these defendants, in good faith, to now lose their lands after a tenure of them for practically forty years.

How does plaintiff pretend to attack collaterally the plain, legally-permitted language of these recorded patents, now nearly fifty years later?

Plaintiff claims Executive Order No. 3365 of December 7, 1920, extended the 25-year trust to a total of fifty years after the dates of the patents. But the validity or effect of the Executive Order should be of no concern to us and can have no bearing on this case unless it would be determined that the patents should be corrected to write into them the limitation under the 1884 law. But even if that conclusion were supported by the record and the law, this suit would still be too late as it also is clear that the Executive Order could not apply to the patents before the Court.

While plaintiff refers to numerous authorities dealing with such extensions and the Act of June 21, 1906, 25 U.S.C.A. § 391, by which they were authorized, the brief does not point to any case holding that patents could be corrected after the 25-year period has expired and that the correction would be so retroactive that the Executive Order during the first term could now be made effective. The Joyce case, supra, that decision which plaintiff erroneously believes is pertinent here, did not involve an extension of the term. And all the cases cited in plaintiff's brief on the subject upheld the right of extension and the Act of 1906 on the theory that the Government had retained jurisdiction of the lands by the very wording of the patent issued and they also all dealt with Indians who were wards of the Government and who could not have acquired good title or complete title while that status continued.

The Executive Order itself denies its application to this case, even if we should hold that the present patents should be limited to the trust allowed by the Act of 1884. That Order reads: "It is hereby ordered under authority found in the Act of June twenty-first, nineteen hundred and six (thirty-fourth statutes at large, pages three hundred and twenty-five and three hundred and twenty-six), that the trust or other period of restriction against alienation contained in any patent heretofore issued to any Indian for any lands on the public domain be, and the same is hereby extended for a further period of twenty-five years from the date on which any such trust would otherwise expire."

By its plain words it is intended to apply only to the restrictions "* * * contained in any patent heretofore issued * * *". The Act of 1906, under which it originally issued, dealt primarily with Indian allottees, but the Supreme Court did in a case cited by it hold it applicable to those who had acquired patents under the Act of 1884. But the language of the Act itself clearly limited its application to patents "* * * containing restrictions upon alienation * * *" that had been so issued or should thereafter issue.

Plaintiff lays stress on the case of United States v. Gilbertson, 7 Cir., 111 F.2d 978. That case did uphold the right of extension when exercised during the trust period provided for in the patent. The following language, from 111 F.2d at page 979, shows that the case could not fit here: "The patent containing the necessary limitation upon alienation was duly recorded in the county in which the patented land was located."

And that case, along the line of all similar decisions, was termed an action by the Government "* * * to restore to its Indian wards * * *" the land that had been allotted for them. And, different from this case, the "* * * action was brought in behalf of her two heirs at law, a son and a daughter", while here the ac-

tion is one by the United States itself and it has proved no one who could be benefited under the trust or its extension nor to whom the United States would hereafter be bound should it recover a judgment in this lawsuit.

The case that even more strongly denies plaintiff's claim, although it is cited as authority in its favor, is United States v. Jackson, 280 U. S. 183, 50 S.Ct. 143, 148, 74 L.Ed. 361. That decision laid down the rule that the Act of 1906, although dealing particularly with "allottees" had for its purpose the protection of the wards of the Government and, therefore, must be extended to those holding patents containing the restriction or trust fixed by the Act of 1884. But the important thing in the decision, which is far from being in plaintiff's favor, is that it recognized the importance and authority of decisions of the Land Dapartment in determining the applicabilities of the law and facts to different or certain classes of Indians and while it was held that when a patent properly contained a restriction of the title, the extension was effective, the Court was careful to limit the force of its ruling so that it denies plaintiff here any rights whatever: "Nothing herein contained must be taken as intimating that the Act of June 21, 1906, has any application to the acquisition of homestead rights under the general homestead laws by persons of the Indian race who have acquired or seek to acquire such rights as citizens rather than as Indian wards of the United States. This distinction is pointed out in Case of Frank Bergerton, 30 Land Dec. 375."

The Act of 1906, said the Court, and necessarily the Executive Order of 1920, could have no application to the acquisition of land by Indians when they have acquired as citizens and not as wards of the Government. So that under the decision neither the Act nor the Executive Order would have any bearing on the titles here that were acquired by Indians who were not wards of the Government and who had the right to get title under the homestead laws like anyone else.

And it follows that even if anyone could agree that the patents should have been issued under the Act of 1884, the Court would have to find that this suit comes too late. As they could not possibly be corrected now to create a situation making them subject to an extension given thirty years ago.

Defendants, in the alternative, pleaded the Statute of Limitation denying the Government right to vacate or annul patents unless suit should be brought within six years after they have been issued.

Section 1166, Title 43, U.S.C.A. provides as follows: "Suits by the United States to vacate and annul any patent shall only be brought within six years after the date of the issuance of such patents."

The defense is of no moment, because the patents were issued within the jurisdiction of the Land Department, and therefore, could not have been questioned by the Government.

If it should be admitted, for argument, that patents actually issued under the Act of 1884 and could have issued under no other law, the Statute of Limitation would deny this claim because of one factual condition that avoids a contrary rule of law and brings this particular suit within the six year prescription.

Plaintiff had the opportunity, and was offered the necessary delays, to prove the marriages of these so-called Indians who were named as patentees. It made no attempt to do so. It offered no evidence of their family history so that the record is absolutely devoid of anything that indicates that this suit is brought for and on behalf of any particular individual or for any particular group of Indians. The Act of 1884, which plaintiff attempts to attach to the patents in suit, 43 U.S.C.A. § 190, provides that the trust patents so issued shall be for the benefit of the Indian entryman "* * * or, in case of his decease, of his widow and heirs according to the laws of the State where such land is located * * *".

But here, so far as anyone knows, there are no widows nor are there any heirs of the entrymen who could succeed to the trust (if any had been granted) according to the laws of the State of Louisiana.

And, according to 25 U.S.C.A. § 373b, when an Indian who held a restricted homestead title has died intestate without heirs, "* * * the land or interest therein * * * shall escheat to the United States * * * and the land shall become part of the public domain * * *".

This suit now asks for judgment in favor of the United States subject only to any rights that might be shown to exist under the alleged trust which it is claimed should have been included in the patents. But there is nothing which would allow judgment for the benefit of any particular Indian here. And, therefore, should judgment be rendered for the United States it would be bound to no Indian to hereafter carry out the trust; and, in fact, it could always deny any claim that might be so made and the findings of its Land Department would be final.

And, therefore, the true nature of this suit is to set aside the patents on the theory that the title, which should have been in trust, has reverted to the United States because of the absence of heirs who would benefit by rewriting the patents with the trust provisions. The effect of any decree that would be rendered in plaintiff's favor here would be to make the land part of the public domain.

The Joyce case, supra, on which plaintiff so hopefully relies, denied a similar plea under the Statute of Limitation; but, that opinion is not pertinent here when the facts were so different and when the result of a decision in plaintiff's favor in this case could only give complete title to the United States rather than one for the benefit of the heirs of Indian wards of the Government. In the Joyce case the limitation was not applied principally because the trust title was sought to be enforced for one of the heirs of the patentee who had attempted to sell although two heirs had never parted with their interest, trust or otherwise. But the Court admitted that if the action were one resulting in annulling the patent, as it would here, the limitation would be good.

Cramer v. United States, 261 U.S. 219, 43 S.Ct. 342, 346, 67 L.Ed. 622, while denying the statute there, upholds it here, by the following language: "The object of that statute is to extinguish any right the *government* may have in the land which is the subject of the patent, not to foreclose claims of third parties. Here the purpose of the annulment was not to establish the right of the United States to the lands, but to remove a cloud upon the possessory rights of its wards." (Emphasis by the Court.)

Here there are no claims by any particular Indian third parties or on their behalf; the suit does not seek to uphold the possessory rights of government wards or even of any named Indians who are free. On the other hand the suit, if successful, would set aside the patents entirely and give title to the United States. As said by the Supreme Court, the object of the Statute is "* * * to extinguish any right the *government* may have in the land * * *" and in order to carry out that object, and if it were necessary to the defense, the Statute would deny plaintiff's suit even if full patents were erroneously issued by the Land Department in the first place.

Most of the defendants alternatively pleaded good faith purchase of the lands and the proof shows complete titles into the defendants named in Article VI of the complaint. That defense was not necessary to their case and was even of less importance to the other defendants who have actual physical possession of their lands. But the proof was offered principally to avoid any impression that this case is one against those who might be trespassing on Government lands when actually they have held title and paid taxes under a valid legal chain originating with the patentees many years ago.

■ Plaintiff's brief quotes language from the Joyce case, supra, on this subject, which is said to fix a rule of proof in support of a claim of an innocent purchase. But Louisiana laws apply here and the only notice is that of registry. The deeds themselves are proof of innocent purchase and a proof of payment of considerations for the lands. But aside from these considera-

tions, the decisions which plaintiff cites relate to titles attacked by the Government on the grounds of fraud and the principal case relied upon—Wright, Blodgett Co. v. United States, 236 U.S. 397, 35 S.Ct. 339, 59 L.Ed. 637,—was one in which it was proved that the holder of the title while not a party to the fraud was fully cognizant of it.

But the Government here has proved no fact to throw any doubt on the rights of defendants; and if the defendants had any burden in this case it has now been discharged.

The United States of America, after over forty years have passed, attempts to take from its citizens title to more than 1100 acres of valuable land for the alleged benefit of unknown and unnamed Indians but in reality for the Government itself. What precipitated this lawsuit does not appear in the record, but it is obvious that something brought it about other than a claim by individual Indians when no attempt was made to sustain a trust title for their benefit. Not only is the action unconscionable in itself, but it appears to have been brought without regard to the facts and in disregard of the laws that uphold the action of the Land Department in issuing the patents given years ago.

Plaintiff took on the burden of proving that the patents were issued without legal right; but it failed to support that claim. For there is no dispute that the patentees (Indians with no tribal relations) were qualified under the law to receive fee patents which were issued to them without the restraints of the Act of 1884. When the Department had jurisdiction, the law is that this Court should not even inquire into the antecedent proceedings; but, inquiry here, if made, would prove that the Department must have concluded that these Indians were not entitled to patents under the 1884 Act but that patents should issue to them as citizens, as nontribal Indians, and, therefore, not in trust. The final certificates and the patents themselves are evidence of those findings of fact by the Department.

Judgment in keeping with the above opinion will be signed upon presentation.